**NORTHWEST OTOLARYNGOLOGY ASSOCIATES, William S. Rubenstein, M.D., & George N. Kornreich, M.D., Appellants,**

v.

**MOBILEASE, INC., Appellee.**

No. 9756.

Court of Appeals of Texas, Texarkana.

Jan. 23, 1990.

Rehearing Denied Feb. 21, 1990.

---

Randal L. Payne, Sullins, Johnston, Rohrbach & Magers, Houston, for appellants.

Lynda F. Scoblick, Daniels, Gambill & Collins, Houston, for appellee.

GRANT, Justice.

Northwest Otolaryngology Associates, a partnership, Will Rubenstein, M.D., and George Kornreich, M.D. (referred to collectively as Northwest) appeal from a judgment granted to Mobilease, Inc., in the amount of $11,518.63 plus attorney's fees of $1,627.89. Mobilease also appeals from a judgment granted to Northwest in the amount of $3,800 plus attorney's fees of $2,500.

Northwest contends that the trial court erred because there was insufficient or no evidence to support the granting of the judgment, because Mobilease did not perform the conditions precedent under the terms of its contract, because Northwest did not breach its contract, because Mobilease was not entitled to attorney's fees, and because the trial court failed to find reasonable attorney's fees for Northwest in the event of an appeal.

In cross-points, Mobilease contends that the trial court erred in awarding damages and attorney's fees to Northwest because there was insufficient evidence to establish that Northwest suffered damages or was entitled to recover such damages and because the trial court erred in failing to award attorney's fees to Mobilease.

On June 22, 1984, Mobilease and Northwest entered into a written lease agreement. Under the terms of the agreement, Northwest leased a 1984 Maserati Bi-Turbo from Mobilease for forty-eight months for $515.75 per month. Mobilease then assigned the lease to First Pennsylvania Bank. Ralph Natale (initially a party to the suit but later nonsuited by Mobilease), Kornreich and Rubenstein executed a statement certifying to the bank that they were all partners in Northwest with full power and authority to act in the name of the partnership. Several monthly payments were made by Northwest in the form of checks signed by Rubenstein. On July 19, 1984, Mobilease unconditionally guaranteed performance under the lease to the bank in the event that Northwest defaulted.

On March 13, 1986, the bank sent a written demand to Northwest stating Northwest was in default and declaring that the payments were accelerated and presently due in the amount of $22,524.77. On the same day, the Maserati was repossessed by the bank. On March 14, 1986, the bank made a demand for $22,057.67 on Mobilease pursuant to the guaranty agreement. On the same day, Mobilease paid the bank pursuant to their demand and took possession of the automobile. On March 18, 1986,

Mobilease made a demand on Northwest to pay the total balance due of $22,518.63. On March 19, 1986, the bank sent a letter to Northwest advising Northwest that it was responsible for any deficiency created by the default. Approximately three weeks later, Mobilease again made a demand on Northwest for payment under the lease.

Mobilease filed suit against Northwest for breach of contract, and it also began conditioning the vehicle for sale and obtained offers in May, 1986, for the vehicle. Mobilease advised Northwest in writing that the highest available cash offer at wholesale was $11,000 and further advised Northwest that the amount of loss according to the terms of the lease agreement would be $11,518.63. Northwest made no payments in response to this demand. Mobilease later sold the vehicle for $9,000 but credited Northwest with the $11,000 bid. It was not until March 2, 1987, that the bank reassigned the lease to Mobilease.

Northwest challenges the sufficiency of the evidence to show that Mobilease was entitled to recover in the capacity in which it sued. In reviewing no evidence points, the court considers only the evidence tending to support the finding, viewing it in the light most favorable, giving effect to all reasonable inferences therefrom, and disregarding all contrary and conflicting evidence. *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981). If upon such review the court finds there is a complete absence of evidence of probative force to support the finding, or only a scintilla of evidence to support it, or if the evidence tending to support the finding must be disregarded because it is incompetent or is otherwise legally insufficient, the point must be sustained. If there is any probative evidence, more than a scintilla, in support of the finding, the point must be overruled and the judgment will be affirmed unless a factual insufficiency point has also been raised and the court sustains it on the basis of a full review of the evidence. Insufficient evidence points require that we consider and weigh all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ The present case is very similar to the case of *Fulton v. Edge*, 435 S.W.2d 263 (Tex.Civ.App.–Waco 1968, writ ref'd n.r.e.). In that case, Fulton had leased equipment to Edge and assigned the lease to the bank while at the same time guaranteeing the payments to the bank as the lease provided. The court held that Fulton was not relegated to contractual rights as assignee of the lease contract. He was entitled to pursue his subrogation rights as guarantor by virtue of having paid the obligation of Edge to the bank. The court stated that this right of subrogation was not derived from nor dependent upon the equipment lease contract or its assignment to him by the creditor bank. In the present case, Mobilease discharged its obligation under its liability as the guarantor and was entitled to pursue its action for reimbursement against Northwest as the principal obligor. We find that there is sufficient evidence on this point and overrule Northwest's points of error complaining of the sufficiency of the evidence.

■ Northwest also contends that, because Mobilease immediately after execution assigned its rights under the lease to the bank, Mobilease lacked standing or capacity to recover for any breach of the lease agreement. Northwest complains that Mobilease did not plead the theory of subrogation and therefore cannot base its recovery upon subrogation rights obtained from the bank by paying off the balance owed under the lease. Northwest waived its right to complain about the lack of pleadings when it failed to object to direct evidence about subrogation at the trial. Lynda Scoblick, attorney of record for Mobilease, testified as follows:

Q Find where Northwest guaranteed to—

A They guaranteed to First Penn and at the time that we paid off our First Penn, we were subrogated to the rights of First Penn. We stepped into their shoes. We became First Penn, if you will, and Northwest wasn't obligated to us.

Thus, we conclude that this matter was tried by consent. *Realtex Corp. v. Tyler,* 627 S.W.2d 441 (Tex.Civ.App.–Houston [1st Dist.], no writ); Tex.R.Civ.P. 67. This point of error is overruled.

■ When no findings of fact or conclusions of law are requested or filed, we presume that the trial court made all findings necessary to support its judgment and we affirm if there is any legal theory sufficiently raised in the evidence in support of the judgment. *Davis v. Huey,* 571 S.W.2d 859 (Tex.1978); *Seaman v. Seaman,* 425 S.W.2d 339 (Tex.1968). In reviewing the record to determine if there is any evidence to support the judgment and the implied findings, we consider only the evidence favorable to the issue and disregard all evidence or inferences to the contrary. *Carter v. William Sommerville and Son, Inc.,* 584 S.W.2d 274 (Tex.1979).

Northwest contends that the trial court erred in granting judgment for Mobilease on breach of the lease because there was no evidence that all conditions precedent were performed. Specifically, Northwest contends that the bids were not promptly taken. The pertinent provisions of the lease are as follows:

9. TERMINATION: ... When a vehicle is returned to Lessor upon termination whether prior to, at, or after the end of the Initial Lease Term, Lessor shall *promptly* obtain the highest available cash offer at wholesale for the vehicle and notify Lessee in writing of the offer indicating the loss, if any, computed pursuant to this paragraph, which would result from acceptance of such offer, Lessee will then notify Lessor in writing within five (5) business days after the date of dispatch of Lessor's notice, that it will bear such loss or will otherwise arrange for the immediate sale of the vehicle in order to obtain for the Lessor the Terminated Value, as specified in Subparagraph (a), (b) or (c).... The loss on any final disposition shall be the difference between the offer received, and such Termination Value of the vehicle. If Lessee fails to make any election within said 5 business days, Lessor is autho-

rized to accept such offer and to debit Lessee with any resulting loss....

....

23. DEFAULTS: ... Time is of the essence in this lease. If Lessee shall default in the payment or performance of any obligation hereunder, ... then in any of such events Lessor at its option may terminate this lease, and the provisions of Item 9 shall apply as to such terminated vehicle.

■ Mobilease contends that Item 9 is not a condition precedent but rather a covenant. A condition precedent to an obligation to perform is that act or event which occurs subsequent to the making of the contract that must occur before there is a right to immediate performance and before there is a breach of contractual duty. The language of a contract will not be construed as creating a condition precedent if another reading of that language is possible. *Powers v. Powers,* 714 S.W.2d 384 (Tex.App.–Corpus Christi 1986, no writ). To determine the existence of a condition precedent, we must look to the entire contract to ascertain the intention of the parties. It is a rule of construction that a forfeiture by finding a condition precedent is to be avoided when possible under another reasonable reading of the contract. *Hudson v. Wakefield,* 645 S.W.2d 427 (Tex. 1983). We have determined that the provision in the contract is a covenant, not a condition precedent. Therefore, this point of error is overruled.

■ Next, Northwest argues that the trial court erred in ruling that Northwest waived its hearsay objections to the plaintiff's exhibits 1–30 for its failure to file written evidentiary objections prior to the trial of the case. Northwest contends that the docket control notice could not support court sanctions against Northwest because it did not give fair notice that a waiver of hearsay objections could result from a failure to file objections to another party's pretrial order and attached exhibits. The language in the docket control notice is as follows:

10–19–87 A JOINT PRE–TRIAL ORDER will be filed by this date. COUN-

SEL FOR PLAINTIFF IS RESPONSIBLE FOR THE TIMELY FILING OF PRE–TRIAL ORDER. FAILURE TO DO SO MAY RESULT IN SANCTIONS UNDER RULE 166(b) TRCP.

Northwest correctly contends that notice is essential for the proper imposition of sanctions. *See Zep Manufacturing Co. v. Anthony*, 752 S.W.2d 687 (Tex.App.–Houston [1st Dist.] 1988, no writ); Tex.R.Civ.P. 215.

We find no pretrial order in the record imposing sanctions against Northwest. The trial court on several occasions told Northwest that it could make objections to the exhibits, but at one point in the trial, the trial judge stated, "I've admitted them because they were not objected to on pretrial order." Thus, they were deemed admitted under the pretrial order of the court. The trial court also allowed Northwest to make a running objection to hearsay in plaintiff's exhibits 1–30.

Northwest complains that the proof of its default came into evidence through these documents. The default is shown in some of the documents by written statements and demand made by First Pennsylvania Bank, which was not a party to the lawsuit. We shall discuss this in conjunction with Northwest's next contention that the trial court erred in granting judgment because there was no evidence of an event of default under the lease.

Excluding the demand letters from the bank declaring the lease payments overdue and accelerating the payments, there is unobjected-to testimony by Gary Johnson that the account was four months in arrears, which amounted to $2,063. This is sufficient evidence to establish the default without plaintiff's exhibits 1–30. These points of error are overruled.

Northwest contends that the trial court erred in granting judgment against Rubenstein and Kornreich because they were not general partners of the partnership Northwest Otolaryngology Associates.

A limited partnership acts only through its general partner. *Tomlin v. Ceres Corporation*, 507 F.2d 642 (5th Cir. 1975). Ralph Natale, William S. Rubenstein and George N. Kornreich signed a documentin this transaction, which is in evidence, stating that each one of them was a partner with full power and authority to act on behalf of the partnership. This was sufficient evidence for the judge to have determined that they were general partners and thus jointly and severally liable.

By way of cross-points, Mobilease complains about damages awarded to Northwest on a counterclaim. Northwest alleged that Mobilease had breached the lease agreement and its obligation of good faith and fair dealing in performance of the lease agreement, that Mobilease had made material misrepresentations to Northwest, and that Mobilease had violated various provisions of the Deceptive Trade Practices Act. The trial court awarded Northwest $3,800 damages plus attorney's fees in the amount of $2,500. Mobilease has appealed the court's award.

In its first cross-point, Mobilease contends that the trial court erred in awarding damages and attorney's fees for Northwest because there was insufficient evidence to establish that Northwest suffered damages or was entitled to recover such damages. Northwest contends that there is evidence to support the award of $3,800 to Northwest on the basis of Dr. Rubenstein's testimony about what occurred when he received the demand letter from Mobilease's attorney. That testimony is as follows:

Q What, if anything, did you do shortly after receiving that letter?

A Well, I believe that's about the time that we engaged Mr. Johnson's firm to represent us and straighten this out because we felt that we didn't owe any of this and I didn't know what it was all about.

Q Did you attempt to check the partnership records for any evidence of any of the allegations that were being made in this April 17th letter?

A At that point, I really didn't have to because the partnership was no longer in existence. We had separated in '85; and at that time, we had separated it. We had gone over a number of differ-

ent things. So I knew there was no question.

Q Doctor, maybe I'm not making myself clear. I'm asking you for what actions you personally took shortly after you received it.

A Well, what we did was: Number one, we sought legal advice; number two, I believe I had my office manager start going through some records and I went back through the records looking for anything that was in reference to this that might have occurred with the accounts and with my office manager. That was the main steps that we took at that time.

Q How much time did you spend doing that, sir?

A Well, there was all told—you're talking about any specific thing?

Q I'm talking about in the first few days after you received it.

A I'd say we probably spent a full day and a half between everything we did—maybe two days in the beginning.

From that testimony, Northwest contends that Northwest lost profits from the day and a half to two days that Dr. Rubenstein and the office manager took time off from regular revenue generating activities. Northwest contends that this was caused by the confusion of having received demands from both the bank and from Mobilease. There was no showing that Northwest attempted to pay either the bank or Mobilease for the money past due under the contract.

 Northwest also contends that it was damaged because of the doctors' lost time while depositions were taken during the suit. Damages for lost profits are recoverable when such profits are contemplated at the time the contract is created. *Martin v. Darcy*, 357 S.W.2d 457 (Tex.Civ. App.–San Antonio 1962, writ ref'd n.r.e.). However, the Deceptive Trade Practices Act is intended to allow a plaintiff to recover "actual damages," which means those damages recoverable at common law. *Farrell v. Hunt*, 714 S.W.2d 298 (Tex.1986). Time spent in investigation and depositions is not compensable under common law mea-

sures of damages and do not constitute recoverable damages in this case.

 Northwest has also complained that bids were not promptly taken and that Mobilease did not follow the proper procedure for selling the vehicle. However, Northwest has not shown that it could have obtained more than the $11,000 for which it was credited. Thus, no damages are shown under this allegation.

 Northwest also argues that Mobilease made a $1,420 profit by buying the vehicle in question from a dealership and then marking it up. It complains because it was not informed of this fact. We have found no law or case requiring a lessor to inform the lessee of the purchase price of a vehicle or other property being leased. Entities that lease or sell vehicles as a business are certainly allowed to make a profit and are not required to divulge the amount to their customers. There is no allegation that there was a misrepresentation as to the purchase price, and the failure to disclose the purchase price is not a violation of the Deceptive Trade Practices Act. Since no damages are shown by the evidence, Northwest is not entitled to recover attorney's fees.

Mobilease also complains by way of a cross-point that the trial court erred in failing to award attorney's fees to Mobilease as pled and proved in the amount of $9,000 through trial, an additional $8,000 in the event of appeal to the Court of Appeals, and $5,000 in the event the case goes to the Supreme Court of Texas.

 Mobilease was awarded attorney's fees in the amount of $1,627.89. Northwest contends in its response to this cross-point that Mobilease failed to designate an expert witness on attorney's fees and therefore there was no evidence to support attorney's fees. Northwest cites the case of *E. F. Hutton & Co., Inc. v. Youngblood*, 741 S.W.2d 363 (Tex.1987), for the proposition that the testimony of an undesignated expert witness over proper objection is in effect no evidence and will not support a judgment for attorney's fees. The Supreme Court in the *Hutton* case held that,

when properly appealed, a judgment based upon such testimony could be set aside. However, in the present case, the trial court admitted the evidence, and Northwest did not appeal the trial court's ruling. For that reason, the evidence will be considered in support of the attorney's fees.

The amount of attorney's fees awarded is within the sound discretion of the trial court and should not be disturbed on appeal unless there is a clear abuse of discretion. The appellate court is not allowed to substitute its judgment for that of the trial court but is to determine if the trial court's decision was arbitrary or unreasonable. *Magers v. Durham*, 720 S.W.2d 871 (Tex. App.–Fort Worth 1986, writ dism'd). The function of the factfinder is to pass on the weight of the evidence and the credibility of the witnesses. We find no abuse of discretion in awarding Mobilease attorney's fees in the amount of $1,627.89. However, we find that there were pleadings and evidence of entitlement to attorney's fees in the event of an appeal to the Court of Appeals and also in the event the case should be taken to the Supreme Court of Texas. These fees should be conditioned on Mobilease ultimately prevailing.

The judgment for Northwest in the amount of $3,800, along with attorney's fees of $2,500, is hereby reversed and rendered. The judgment granted to Mobilease in the amount of $11,518.63 plus attorney's fees of $1,627.89 is hereby affirmed. The portion of the case relating to the setting of attorney's fees for Mobilease for the appeal to the Court of Appeals and attorney's fees in the event the case proceeds to the Supreme Court of Texas is severed and remanded to the trial court for a determination of proper amounts for these fees.